**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOV SEIDMAN and LRN CORPORATION, | 14-CV-4050 (PGG) |
| Plaintiffs, | Jury Trial Requested |
| v. | **FIRST AMENDED COMPLAINT** |
| CHOBANI, LLC and DROGA5, LLC, | |
| Defendants. | |

Plaintiffs Dov Seidman ("Seidman") and LRN Corporation ("LRN") (collectively "Plaintiffs") allege as follows against Defendants Chobani LLC ("Chobani") and Droga5 LLC ("Droga5") upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters:

<div align="center"><u>Nature of the Action</u></div>

1.      Dov Seidman and LRN, whose business is based on promoting ethical, values-based behavior, have spent many years – this is Seidman's life's work – and many millions of dollars developing, communicating and amplifying the philosophy that "*how* matters": for people and businesses alike, it is no longer what you do that matters most and sets you apart from others, but how you do what you do.  Seidman has described this philosophy in his bestselling book *HOW: Why How We Do Anything Means Everything.*

2.      One of the most significant contributions Seidman and LRN have made to the public discourse is to introduce a new vocabulary to encapsulate key elements of a *how* philosophy.  In particular, Seidman and LRN have popularized using the word "how" as a noun, rather than the typical use of that word as an adverb – in order to underscore that, in an increasingly transparent and interconnected world, "*how* matters" more than ever, and in ways it never has before.  Seidman's use of "how" as a noun has given it a distinct meaning, expressing

the values-based ethos of individual and organizational behavior at the center of his *how* philosophy.  Phrases such as "*how* is the answer," "*how* matters," and "get your *hows* right" are uniquely identified with Seidman, his philosophy, his related work, and the company he founded, LRN.

3.      Seidman and LRN have communicated this *how* philosophy and "*how* matters" messaging through a comprehensive range of domestic and global business activities, including a bestselling book, articles, speeches, presentations, television and radio appearances, videos, website materials, reports and publications, case studies, online courses, educational courses and materials, and, importantly, a comprehensive social media platform.  This "*how* matters" messaging and "*how*"-related branding has long been a cornerstone of how Seidman and LRN go to market, and is critical to their competitive positioning in the marketplace.

4.      On January 29, 2014, Defendant Chobani, a yogurt manufacturer, sent the following message to Seidman via Twitter:



5.      Within days of that tweet, Chobani launched a major advertising campaign and corporate branding platform during the Super Bowl built around the message "*how* matters" and bearing a striking resemblance to the messaging and branding that has long been central to Seidman's and LRN's work.  It was immediately clear to Seidman that this advertising and branding campaign, using the same vocabulary that was publicly associated with his own (and LRN's) work and *how* philosophy, posed a serious threat to Seidman's and LRN's business.

2

6.      Immediately after the Super Bowl campaign launch, Seidman began hearing from people who assumed (wrongly) that Seidman had licensed his intellectual property to Chobani for the campaign.  People accused Seidman of having "sold out" by letting Chobani use his unique "*how*" vocabulary and "*how* matters" branding to imply some sort of endorsement by Seidman and LRN for Chobani's commercial advantage, or that Seidman was now sponsoring Chobani's products or corporate messaging.  Others expressed concern that Seidman's unique vocabulary and branding would be diluted and undermined by Chobani's campaign.

7.      As soon as Seidman saw Chobani's Super Bowl campaign launch, and also discovered that Chobani was apparently seeking to trademark the phrase "How Matters," he contacted his agent Jay Mandel ("Mandel").  Mandel worked (and still works) for William Morris Endeavor Entertainment, LLC ("WME"), a talent agency that has represented Seidman for more than ten years.  Seidman was very concerned about the Chobani campaign, and sought his agent's advice on how to deal with this problem.

8.      Mandel told Seidman that Droga5, an advertising agency, had developed the campaign for Chobani.  WME had acquired a large stake in Droga5 back in 2013, and Mandel said he would reach out to Droga5 on Seidman's behalf.

9.      On February 8, 2014, Andrew Essex, at the time the Vice Chairman of Droga5, emailed Seidman, acknowledging that Droga5 should have "reached out in a more thoughtful fashion prior to [the How Matters campaign's] release." But Essex also tried to convince Seidman that the Chobani campaign had nothing to do with Seidman's work, telling Seidman that "[a]ny similarities I can assure you are purely coincidental."

10.     Seidman and LRN tried for several months to engage with Chobani and Droga5 to resolve these issues amicably.  Droga5, however, only paid them "lip service" (as Seidman's

other WME agent, Jennifer Rudolph Walsh, put it), and although Chobani initially scheduled a meeting with Seidman, it then cancelled the meeting and rebuffed any further requests to meet. Seidman and LRN were eventually forced to file this lawsuit against Chobani and Droga5, in part to prevent Chobani from obtaining a trademark on the phrase "how matters" – a trademark that Seidman and LRN for obvious reasons could not let issue.

11.     Seidman owns numerous "how"-related trademarks, which he has licensed to LRN.  When Seidman and LRN first filed this lawsuit, in June 2014, the lawsuit focused on claims that Chobani's massive "How Matters" advertising and branding campaign infringed those trademarks, with Droga5 having contributed to the infringement by creating and promoting the campaign for Chobani.

12.     Seidman and LRN suspected that Chobani's and Droga5's infringement had been willful, including because Seidman and LRN had reason to believe that Seidman's "how"-related messaging and marks had been discussed at a Droga5 meeting held in late 2013, months before the campaign launched.  Seidman and LRN alleged as much in the original complaint in this case.  *See* Compl. [Dkt. 1] ¶¶ 3, 37, 38.  In their answers to the original complaint, however, Chobani and Droga5 flatly denied having knowledge of Seidman's "how" message or marks months before launching the Chobani "How Matters" campaign, and Droga5 denied the allegation that Seidman and his "how" message and marks had been discussed in a late 2013 meeting.  *See* Chobani Answer [Dkt. 12] ¶¶ 3, 37, 38; Droga5 Answer [Dkt. 9] ¶¶ 3, 37, 38.[1]

13.     Discovery in this case has proven indisputably that these denials were false.

---

[1] Regarding the late 2013 Droga5 meeting, Chobani averred that it lacked knowledge or information sufficient to form a belief as to that allegation.  *See* Chobani Answer [Dkt. 12] ¶¶ 3, 38.

14.     Deposition and documentary evidence confirm that Seidman and his "how"-related messaging were discussed at that November 2013 Droga5 meeting – a meeting also attended by WME personnel, including Mandel.  The "How movement" and "thought leader" Dov Seidman were discussed at that meeting, and Mandel himself testified at his deposition in this case that he told senior Droga5 representatives at that meeting that Seidman was "the gold standard for this line of thinking" – that is, the "how matters" line of thinking that became the centerpiece of the advertising and branding campaign that Chobani launched in 2014.  Mandel also described Seidman in a November 2013 email to a senior Droga5 employee as a "gateway to a ton of content" – precisely the same phrase that the Droga5 employee used to describe Seidman in an email later that same day to several senior Droga5 colleagues.

15.     In fact, evidence uncovered in discovery proves that Droga5 knew about Seidman and his "how" philosophy and messaging no later than August 2013, when Droga5 was still in the process of competing for the Chobani account.  Mandel, who at his deposition admitted his "involvement with the Droga team" around this time, described Seidman and his how-related work and writings to the Droga5 team, telling them that Seidman was "someone whose philosophy aligned with [Chobani's] branding ideas," and directing them to the *HOW* book and to Plaintiffs' website, www.howistheanswer.com.

16.     After reviewing the materials suggested by Mandel, a senior Droga5 executive emailed the entire Droga5 creative and pitch teams (including Droga5 founder and Creative Chairman David Droga) describing Seidman as a "treasure trove of How Matters information," specifically noting that Seidman "has a How Metric to measure the impact of How," and encouraging all of them to watch Seidman's video on the howistheanswer.com website.  Another Droga5 executive identified "soundbites" from the Seidman video "that I love," such as "how

versus how much," and urged that "someone needs to say" these soundbites in Droga5's upcoming pitch presentation to Chobani.

17.     Up to that point, Droga5 had been considering several different branding concepts involving "doing things the right way."  Among the different potential themes Droga5 had been considering were "Good Beats Bad," "Couldn't Care More," and "You Get the Love You Give."

18.     Another potential theme utilized the tagline "How Matters," but David Droga, who was leading the Chobani pitch for Droga5, had rejected the "How Matters" idea – at least initially.

19.     At some later point, Droga – who was included on the internal Droga5 communications in which senior Droga5 personnel reviewed Seidman's work and commented so favorably on it – changed his mind.  Droga ultimately came to believe that "How Matters" was a "fantastic tagline" and a "platform" where Droga5 could "produce a lot of advertising and marketing" for Chobani.

20.     The "How Matters" proposal proved critical to Droga5's efforts to win the Chobani account, as Chobani's CEO, Hamdi Ulukaya, selected Droga5 over the competing agencies based on that particular proposal.  As a result, Chobani named Droga5 its advertising agency of record.

21.     Chobani was so enamored of Droga5's "How Matters" campaign that it took confidential steps, unbeknownst to Seidman or LRN, to pursue purchasing the HOWMATTERS.COM domain name, which was (and remains) owned by LRN.

22.     In the course of those unsuccessful efforts to purchase HOWMATTERS.COM, no later than October 2013, Chobani learned of Seidman and his "how"-related messaging and philosophy.  In fact, discovery has revealed that a Chobani employee at that time described "how

matters," in an email to senior Chobani employees that was then forwarded to Chobani's Chief Marketing Officer, as "a major theme or campaign" for LRN.  Chobani was thus fully aware of Seidman and LRN, their "how"-related messaging (including their "how matters" messaging), and how central that messaging was to Seidman's and LRN's business, months before Chobani launched its own "How Matters" advertising and branding campaign, despite having denied such knowledge of Plaintiffs' "how" messaging or marks in its Answer.

23.     As explained above and in more detail below, discovery has demonstrated that this is far more than just a trademark infringement case.  Droga5 knew of Seidman's and LRN's "how" messaging and unique "how" vocabulary before they even landed the Chobani account, and they misappropriated that messaging and vocabulary to win the account and develop Chobani's "How Matters" corporate branding and advertising campaign.  For its part, Chobani went along with the misappropriation despite knowing that "how matters" was "a major theme or campaign" for Seidman and LRN.  This misconduct has unjustly enriched Defendants and caused Plaintiffs substantial damage.

<u>**The Parties and Their Relationships**</u>

24.     Dov Seidman is an individual residing and working in New York, New York.  He is the CEO of LRN, which he founded in 1994, and the author of the acclaimed book *HOW: Why How We Do Anything Means Everything.*  First published in 2007, *HOW* is a New York Times and Wall Street Journal Bestseller.  An expanded edition of the book was published in 2011, with a foreword by President Bill Clinton.

25.     LRN is a Delaware corporation with a principal place of business at 745 Fifth Avenue, Suite 800, New York, New York 10151, and with offices in Los Angeles, London, and Mumbai.

26.     Chobani is a yogurt manufacturer with "hometowns of South Edmeston, Twin Falls and New York City," and is incorporated in Delaware.

27.     Droga5 is an advertising agency and Delaware corporation, with a principal place of business at 120 Wall Street, New York, New York 10005.  Droga5's founder and Creative Chairman, David Droga, represents that Droga5 is committed, without exception, to providing original ideas and creative concepts to its clients and prospects – and that, for Droga5, originality and creativity are not only core business ethics, but also a key competitive differentiator, and part of its "DNA."  As part of its commitment to originality, Droga promises that Droga5 takes all reasonable steps, including, specifically, online research, to make sure that the ideas and concepts it presents to clients and prospects are original.  Droga further promises that if Droga5 becomes aware that an idea it is pitching is not original, Droga5 discards that idea in favor of something original.  Among other services, Droga5 helped companies "reinven[t]" their "brand purpose" and "values."

28.     David Droga admits that his conduct, and Droga5's conduct, are governed by the American Marketing Association Statement of Ethics, which requires that advertisers and marketers embody high ethical standards and affirm core values of honesty, responsibility, fairness, respect, transparency and citizenship.

**Jurisdiction and Venue**

29.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because they are substantially related to the federal claims in the case and arise out of the same case or controversy.

30.     Venue lies in this District pursuant to 28 U.S.C. § 1391 (b) and (c) because the Defendants reside and regularly conduct business in this District, a substantial part of the events

4892952v1/015016

giving rise to Plaintiffs' claims have occurred and are continuing to occur in this District, and Plaintiffs' trademarks at issue are located in this District.

## Facts Relevant to the Claims for Relief

### I.    The *How* Philosophy and *How* Vocabulary and Messaging

31.    LRN's purpose is most simply stated as helping people around the world do the right thing.  As LRN explains on its website: "Inspiring people to do the right thing is the essence of principled performance.  It is about inspired rather than required behavior—living principles beyond following rules.  It is about doing the next right thing and not just the next thing right.  Ultimately, principled performance leads to healthier, profitable organizations."

32.    Over the past twenty years, LRN has helped more than 700 companies around the globe – and millions of their employees – to translate their corporate values into concrete behaviors and practices that create advantage and economic value.  LRN and Seidman are the exclusive corporate sponsors of the Elie Wiesel Foundation for Humanity's Prize in Ethics, which encourages and recognizes ethical leadership among college students.

33.    Over that same period, and particularly since Seidman published the first edition of *HOW*, Seidman and LRN have developed and amplified a unique new vocabulary to encapsulate the core of their philosophy.  Seidman and LRN employ this "*how*" vocabulary, including the "*how* matters" messaging and branding, in a wide array of business activities, advertising, and digital advertising, in the United States and internationally, including books, speeches, articles, newsletters, training programs, public presentations, webinars, online educational courses, workshops, website materials, social media, online advertising, surveys, and consulting services.

34.    Consumers of these *how*-branded products and services include corporate leaders and employees in many diverse industries; government leaders and employees; military leaders,

and servicemen and women; leaders and executives in entertainment, sports, marketing, and advertising; students, faculty and administrators in educational institutions; philanthropic and other nonprofit organizations; NGOs; and the general consuming public.  For these consumers, the "*how*" vocabulary and related messaging and branding are directly associated with Seidman and LRN.

35.     In addition, Seidman has been issued several trademark registrations by the U.S. Trademark Office due to his, and his licensee LRN's, widespread use of HOW and a family of associated *how*-based marks, including HOW IS THE ANSWER, THE HOW REPORT, and HOW METRICS.  Those registrations cover, among other things, "business and professional conduct by business organizations," "corporate culture and business, cultural social and environmental responsibility," "values-driven business and values-based business leadership," and "the management and operation of business in an environmentally responsible and environmentally sustainable manner."

36.     Seidman's "how" philosophy has been recognized and embraced by many high-profile supporters and national publications:

- President Bill Clinton: "My friend Dov Seidman has dedicated his life's work to studying *how* people conduct their business and their lives. . . . I am delighted that Dov has written this essential book articulating his complete philosophy of the *how*, including both the necessary shared values for the twenty-first century and actionable ideas to firmly establish these values in our public, business, and personal relationships.   The individuals, organizations, and businesses that understand that *how* we choose to do things matters more than ever before will flourish."

- New York *Times* columnist Thomas L. Friedman (who later wrote another column about Seidman's work titled "Why How Matters"): "[Seidman's] book is simply called 'How.'  Because Seidman's simple thesis is that in this transparent world 'how' you live your life and 'how' you conduct your business matters more than ever, because so many people can now see into what you do and tell so many other people about it on their own without any editor. . . .  Today 'what' you make is quickly copied and sold by everyone.  But 'how' you engage your customers, 'how' you keep your promises and 'how' you collaborate with partners – that's not so easy to copy, and that is where companies can now really differentiate themselves. . . . So . . . get your hows right – how you build trust, how you collaborate, how you lead and how you say you're sorry.  More people than ever will know about it when you do – or don't."

- *Fortune* Magazine: "Seidman has built a highly successful business on the theory that in today's wired and transparent economy, companies that 'outbehave' their competitors ethically will also tend to outperform them financially. . . . Ultimately, the only way to enjoy a good reputation is to earn it by living with integrity.  'We can't control our stories,' Seidman says.  'We can control how we live our lives.'"

- *Time* Magazine (selecting Seidman as a "Game Changer," one of the "innovators and problem-solvers that are inspiring change in America"): "As founder and CEO of LRN, moral philosopher and businessman Dov Seidman helps companies thrive by pursuing both profits and principles."

37.    Plaintiffs' global publication, THE HOW REPORT, organizes more than two million individual observations of behavior using Plaintiffs' analytical assessment tool, HOW METRICS.



38.    Seidman and LRN maintain a strong and continuous social media presence promoting the "*how* matters" message and using the "how" vocabulary, including a Facebook community.



39.    Plaintiffs' "*how* matters" message is conveyed in their publications, presentations, website materials, training, and educational courses, including numerous explicit uses of "How matters" (including lessons, titled "Why HOW Matters," incorporated within widely-viewed LRN courses), consulting services, and workshops.  Here are some examples:





The Executives' Club of Chicago

**New Leaders Development Program**

*HOW Matters: The Key to Unleashing Competitive Advantage and Differentiation*

Dov Seidman, Author, *How: Why HOW We Do Anything Means Everything*

Founder, Chairman and CEO of LRN Corporation

**September 27, 2012 * 5:00 pm to 7:00 pm**

# Forbes

## HOW Matters More Than Ever



**Dov Seidman**, Contributor 10/10/2011







14

40.     Seidman and LRN actively communicate the *how* ethic and vocabulary through Seidman's regular column in *Forbes* Magazine under the title "The HOW Column," as well as through columns Seidman has written in the New York *Times*, Huffington Post, *Fortune*, *Harvard Business Review*, and in other online and media outlets.  Their "*how* matters" message and other *how*-based messaging has also been featured in prominent and popular publications and media outlets such as Good Morning America, All Things Considered (on National Public Radio), The Charlie Rose Show, the *Wall Street Journal*, and *Business Week*.

41.     Seidman and LRN have also given presentations featuring the *how*-branded philosophy and ethos at leading conferences and events such as the World Economic Forum, the Clinton Global Initiative, the Aspen Ideas Festival, Conscious Capitalism, the United Nations Global Compact General Assembly Session, The Economist's Human Potential Summit, the General Counsel Summit, the Women's Foodservice Forum, and the Arthur Page Society, as well as in meetings with leaders and executives at some of the world's leading corporations.

42.     Many leaders, public figures, educators, commentators, media hosts, reviewers and others highlight Seidman's and LRN's *how* vocabulary, and in particular their "*how* matters" message, when referring to the works, products, and services of Seidman and LRN:











43.     In sum, Seidman and LRN have created and developed very substantial goodwill and reputation, over many years – and built a significant and growing business – through prominent and public expression of their *how* vocabulary and "*how* matters" message – and these have become succinct symbols of LRN's and Seidman's products, services, values and philosophy.  They are integral to LRN's and Seidman's business and marketing, and to the many ways in which LRN and Seidman connect and engage with customers, prospects, and other stakeholders.

## II.     Droga5's Early Use of "How Matters" to Win the Chobani Account

44.     In mid-2013, Chobani was looking to hire a new advertising agency.  But it was seeking much more than just a new advertising campaign.  Chobani sought to hire a new advertising agency to develop a whole new corporate identity for Chobani.  It wanted to create a brand expression that was "enduring" and even "timeless" – that would focus on much more than just Chobani's yogurt, address how to treat people, how to do business, and how to support the community at large, and "turn it into a conversation."  The campaign ultimately would show that Chobani was a brand with a "point of view."

45.     Upon being invited to participate in the Chobani pitch process, Droga5 began developing branding concepts involving "doing things the right way."  Droga5 was considering several different potential themes for a Chobani campaign, including "Good Beats Bad," "Couldn't Care More," "You Get the Love You Give," and "How Matters."  According to an email sent by Droga5 Chief Strategy Officer Johnny Bauer, however, David Droga had "killed" the "How Matters" idea, at least as of early August 2014.

46.     At this early stage, Droga5's senior management reached out to WME, which had recently bought a 49% stake in Droga5, for assistance in crafting the pitch to Chobani.  Jay

Mandel, Seidman's agent at WME, responded to members of Droga5's pitch team, noting that Seidman was a WME client, describing Seidman and his how-related work and writings – including that Seidman was "someone whose philosophy aligned with [Chobani's] branding ideas" – and directing Droga5 to the HOW book and to Plaintiffs' website, www.howistheanswer.com.

47.     After reviewing the materials suggested by Mandel, a senior Droga5 executive emailed the entire Droga5 creative and pitch teams (including David Droga) describing Seidman as a "treasure trove of How Matters information," specifically noting that Seidman "has a How Metric to measure the impact of How," and encouraging all of them to watch Seidman's video on the howistheanswer.com website.  Another Droga5 executive identified "soundbites" from the Seidman video "that I love," such as "how versus how much," and urged that "someone needs to say" these soundbites in Droga5's upcoming pitch presentation to Chobani.

48.     The "How Matters" theme proved critical to Droga5's efforts to win the Chobani account.  Chobani selected Droga5 over the competing agencies based on that very theme, and Chobani named Droga5 its advertising agency of record.  In winning the Chobani account with its "How Matters" campaign, Droga5 "beat off challenges from Wieden + Kennedy, Goodby Silverstein, BBH, and The Martin Agency – pretty well the creative cream of the US agency world," as one commentator put it.

49.     Nobody from either Droga5 or WME told Seidman or LRN at the time that they were using Seidman's "how"-related work and writings as part of Droga5's pitch to Chobani, or that Droga5 was proposing a "How Matters" theme to Chobani.  Seidman and LRN did not learn of this until discovery in this case.

### III.   The Development of Chobani's "How Matters" Campaign

50.     After Droga5 won the Chobani account, Chobani and Droga5 proceeded to develop an elaborate, multimedia "How Matters" campaign that mirrored Seidman's and LRN's "*how* matters" ethic and messaging, and adopted their *how* vocabulary.  The campaign also sought to position Chobani (as part of Chobani's re-branding) as leading a national "*how* matters" movement – thus trying to usurp the unique position Seidman and LRN had earned, through years of hard work.

51.     Around November 2013, WME established "Alpha" and "Big Wins" teams to support Droga5's Chobani teams – with Seidman's agent Mandel joining the "Alpha" team.  At one joint meeting held three months before the launch of Chobani's "How Matters" campaign, high-level Droga5 and WME personnel, including Mandel, discussed the development of "*how* matters" content for Chobani, and specifically discussed the "How movement" and "thought leader" Dov Seidman.

52.     The information WME provided to Droga5 about Seidman led Droga5 employees working on the Chobani campaign to describe Seidman, in writing, as the "gateway to a ton of content."  Mandel himself told senior Droga5 representatives that Seidman was "the gold standard for this line of thinking."  Numerous Droga5 employees also commented upon the similarities between Seidman's work and the Chobani "How Matters" campaign.  In fact, a Droga5 employee who was working on the Internet strategy for the campaign – and who apparently had not been involved in any of the earlier meetings or communications where Seidman and LRN were discussed – remarked to a colleague, upon learning for the first time about Seidman and LRN in December 2013, that it was "like they took the strat[egy] right out of our brains."

53.     Shortly after WME and Droga5 discussed the "How movement" in the November 2013 meeting, a senior Droga5 employee observed that Droga5 should "make sure we sort through how to work with him [Seidman] and his supporters or at the very least make sure we don't get accused of trying to copy the language without giving credit."  For his part, Mandel, as he would later recount in an email to Walsh, "urged [Droga5] to be in touch with [Seidman]."

54.     Despite these indications that Droga5 senior managers knew they should reach out to Seidman before proceeding with the campaign, Droga5 continued to press forward with efforts to turn Chobani's "How Matters" campaign into a Chobani-led social movement without ever contacting Seidman or LRN.  In fact, one senior Droga5 executive explained in an internal email that Droga5 intentionally "tried to downplay" the connection to Seidman and the "HOW movement" in a meeting with Chobani.

55.     Nobody from WME informed Seidman or LRN about the development of the Chobani "How Matters" campaign, or Droga5's consideration and use of Seidman's "how"-related work and writings in its development of the campaign, before the campaign's launch. Seidman and LRN thus knew nothing about the campaign before Seidman received the January 29, 2014 Twitter message.  Indeed, Droga5 actively abetted WME's failure to inform Seidman of relevant facts that WME was duty bound to disclose to him, as his agent, by urging WME to keep strictly confidential the impending Super Bowl commercial, which (as both WME and Droga5 knew) would be based on and use Plaintiffs' "how matters" messaging.

**IV.   Chobani's Knowledge of Plaintiffs' "How Matters" Messaging and Decision to Proceed with the "How Matters" Campaign**

56.     Despite Droga5's efforts to "downplay" the connection to Plaintiffs' "HOW movement" and "how matters" message in presenting the campaign to Chobani, by October 2013 at the latest Chobani had become aware of the connection between Plaintiffs' "HOW movement"

and Chobani's "How Matters" campaign.  In early October 2013, Chobani sought to reserve the howmatters.com domain name and discovered that it was owned by LRN.  Chobani's ensuing investigation, including review of the Plaintiffs' website at howisthenaswer.com, confirmed, as one Chobani employee explained in an October 9, 2013 email to other Chobani marketing executives, that "how matters" was a "major theme or campaign" for Plaintiffs.  Chobani Senior Vice President of Marketing Bradley Charron forwarded the October 9 email to Chobani Chief Marketing Officer Peter McGuinness that same day.

57.     Notwithstanding that direct awareness of Plaintiffs' extensive use of "how matters" as a "major theme or campaign," Chobani, like Droga5, chose not to pursue another, original brand and message, such as the other brand ideas and messages recently presented to Chobani by Droga5 (and other agencies).  Instead, Chobani proceeded over the next four months, along with Droga5, to develop and launch its "How Matters" campaign, including attempting to turn the campaign into a Chobani-led social movement, without ever trying to contact Plaintiffs.

58.     Chobani's first contact with Seidman came via its January 29, 2014 Twitter message to Seidman.  That Twitter message was drafted by Droga5 and approved by Chobani.

59.     Chobani's Twitter message to Seidman confirms Chobani's (as well as Droga5's) awareness that the "how" messaging and vocabulary were uniquely associated with Seidman.  While Chobani did send Twitter messages to other public figures or celebrities as part of this same campaign, *see* Droga5 Answer [Dkt. 9] ¶ 39, Chobani's tweet to Seidman was unique in acknowledging Seidman's well-known "how" messaging and vocabulary by placing the word "how" in quotation marks: "@DovSeidman Thanks for inspiring the world to care about 'how.' . . ."

## V.     The Chobani "How Matters" Campaign Launch

60.     Within a day of sending its message to Seidman, Chobani (with Droga5's continued help) proceeded to launch the "How Matters" branding campaign and platform that Droga5 had developed – a campaign that prominently used the very same *how* vocabulary and messaging that Seidman and LRN had created and long worked to popularize:



61.     Chobani's high-profile Super Bowl advertisement a few days later, viewed by millions, likewise used that same vocabulary and messaging, concluding with actor Mandy Patinkin dramatically intoning the phrase "*how* matters."

62.     Moving on from the Super Bowl, Chobani's branding and advertisements – which invoked and leveraged Seidman's core concept of "the how" – continued to emphasize "how" and the "How Matters" message.   Indeed, as Chobani's Chief Marketing Officer, Peter McGuinness, has publicly stated, the purpose of Chobani's campaign and brand platform was to "celebrate, lean in, leverage, our 'how.'"   "There are very few 'how' brands out there, because the how isn't always pretty.   And in our case, we could celebrate it and leverage it against our

4892952v1/015016

competitors."  Even a handful of examples shows that Chobani was invoking this vocabulary and messaging in service of an aspirational branding campaign that focused on how business should be conducted, and that went far beyond yogurt:







63.     Chobani even began putting the phrase "How Matters" directly on its yogurt cups, prominently placed right below the "Chobani" name:



64.     Chobani and Droga5 have emphasized that the Chobani "How Matters" campaign was intended to convey a broad, behavior-based, aspirational message going well beyond yogurt. Statements from Chobani and Droga5 executives confirm that they hoped the "How Matters" campaign would be "timeless" and "enduring," and would become the Chobani equivalent to Nike's iconic, "Just Do It."   In an internal email sent just after the Super Bowl launch of the "How Matters" campaign, one Droga5 executive explained that "[o]ne of the reasons the ["how matters"] platform is so well liked is because we can elevate ourselves above just yogurt and the food industry and start ta[l]king about the really important things in life.  How matters means we have a point of view on the world and allows us to say it."

65.     Though Droga5 recognized Dov Seidman as the leader of the "HOW movement," it actively assisted Chobani's efforts to lead the HOW movement, including through development of a "thunderclap" social media campaign for Chobani.  Through that campaign, Chobani sought public endorsement of, and involvement in, its purported HOW corporate philosophy, as the following representative example demonstrates:



https://www.facebook.com/Chobani, last visited April 30, 2014.

66.     Notably, Chobani's "join us" request copies Plaintiffs "*how* matters" message, in almost verbatim terms:



http://www.howistheanswer.com, last visited April 30, 2014.

**VI.    The Aftermath: Deception and Intransigence**

67.    As described above, after the tweet and the airing of the Super Bowl ad, Seidman received numerous calls from friends and acquaintances asking whether he and LRN had "sold out" to Chobani, the assumption being that Plaintiffs had granted Chobani a license to use their "*how* matters" message.

68.    Seidman emailed his agent Mandel with a request to discuss the tweet he had received from Chobani.  That same day, Seidman forwarded Mandel a tweet from a third party stating "Chobani lifts Dov Seidman's book title how matters."

69.    Prior to Seidman or LRN reaching out to Chobani or Droga5 about the use of "*how* matters," Droga5 was alerted to the issue, presumably by WME.  On February 8, 2014, as described above, Andrew Essex, then the Vice Chairman of Droga5, emailed Seidman, acknowledging that Droga5 should have reached out to Seidman before launching the campaign, but also trying to convince Seidman that the Chobani campaign had nothing to do with Seidman's work, telling Seidman that "[a]ny similarities I can assure you are purely coincidental."

70.     As the evidence described above makes clear, that last statement by Essex was false.  Discovery has revealed that the similarities between Chobani's campaign and Plaintiffs' "*how* matters" messaging were anything but coincidental.  Rather they were deliberate and intended to associate Chobani, in the minds of consumers, with the philosophy created and popularized by Plaintiffs.

71.     Seidman forwarded the Essex email to Mandel, to confirm that Essex had reached out to Seidman at Mandel's request, and Mandel confirmed that was the case.  But despite owing Seidman a duty of candor, Mandel failed to tell Seidman that Essex was not telling him the truth when Essex said that "[a]ny similarities" between the campaign and Seidman's work were "purely coincidental" – a statement Mandel knew to be false based on Mandel's own personal involvement in the development of the campaign.  After all, Mandel himself had repeatedly directed Droga5 to Seidman's work as Droga5 was pitching, and then developing, the campaign.

72.     On March 11, 2014, Plaintiffs met with Whitney Radia, Account Lead on the Chobani business at Droga5, and Droga5's General Manager, Susie Nam.  Nam and Radia acknowledged that Seidman's *HOW* book had been an inspiration for the Chobani campaign.  The Droga5 representatives further stated that, with respect to Plaintiffs, Droga5 and Chobani should have acted differently.  Notably, Droga5 admitted at the March 11 meeting that Chobani's extensive HOW-related trademark use and potential trademark registration of  "How Matters" would lead to instances where Plaintiffs – despite prior use and established rights – could not successfully use their HOW marks.

73.     Plaintiffs also diligently sought to meet with Chobani over a period of months, beginning in February 2014.  With respect to that proposed meeting, David Droga of Droga5 observed:  "[u]rgency, necessity and opportunity is not lost on the team."  Nonetheless, although

a meeting between representatives of Plaintiffs and Chobani was finally scheduled for April 21, 2014, that meeting was cancelled by Chobani.

74.     Based on their belief that companies which espouse ethical behavior and transparency should attempt to resolve disputes through meeting with each other, Plaintiffs made additional meeting requests to Chobani on April 25, May 2, May 19, May 20, and May 28.  Each of those requests was also rebuffed.

75.     Meanwhile, behind the scenes and unbeknownst to Seidman or LRN until they received discovery in this case, WME and Droga5 were candidly communicating about the problems the Chobani campaign had caused Seidman.  In late March 2014, WME's Walsh emailed Droga5's Essex, stating: "Please advise specifically how you recommend we resolve this so that our client doesn't feel robbed and misrepresented. . . . if this escalates further, it will be bad for both our companies."  Over a week later, Walsh again emailed Essex stating:  "I don't believe Droga is engaged enough. We've had lips [sic] service compounded by non-action.  As I said last week, this will blow up on all of us if Dov is not fairly dealt with.  I say this with no irony—how does matter.  This is not being handled correctly."

76.     In a March 2014 email to Walsh, Mandel acknowledged that Seidman "can embarrass everyone involved," which had Mandel "concerned."

77.     Notwithstanding the evidence that they knew of Plaintiffs' HOW marks and "how matters" message, Defendants have continued to falsely represent to the public that they independently created the "How Matters" messaging at the center of their "How Matters" campaign.

78.     Discussing Chobani's "social brand," Chobani's Chief Marketing Officer, Peter McGuinness, falsely claimed:  "It also helps to wrap it in an idea that's unique to [Chobani],

which is that 'How Matters.'"  *Lean back CMOment: Branding, yogurt and bears*, THE

ECONOMIST GROUP (Feb. 10, 2014), available at http://www.economistgroup.com/

leanback/consumers/cmoment-chobani-cmo-peter-mcguinness/.

79.     Droga5, and specifically David Droga himself, falsely claims that the infringing

brand platform "honestly, came out of just conversations with [Chobani]."  David Droga, *The*

*Big Rethink 2014 US - The 360° CMO 2014*, THE ECONOMIST (March 13, 2014),

http://youtu.be/jYLdypqB6Rk.

80.     In addition, as a means of attracting more marketing and advertising business,

Droga5 has touted the "How Matters" campaign it misappropriated from Plaintiffs and sold to

Chobani, on its website and in presentations to clients and prospects.  Droga5 particularly

emphasized its 2014 Super Bowl ad for Chobani.  Droga5 also used its widely-disseminated

"tweet" at Seidman to advertise and promote its "thunderclap" social engagement product, which

Droga5 had recently developed as a means of concentrating and amplifying social media

messages through the Internet.

81.     On June 4, 2014, after weeks of inaction and refusal on the part of Droga5 and

Chobani to meet in good faith with Seidman, LRN and Seidman filed this lawsuit against

Chobani and Droga5.  They were forced at that point to file the lawsuit because Chobani had

applied for trademark protection for the phrase "How Matters," and that trademark application, if

successful, could have legally prevented Seidman and LRN from continuing to use a key part of

the intellectual property they had spent years developing.

82.     At the time Seidman and LRN filed the lawsuit against Chobani and Droga5, they

were still unaware of the extent of WME's role in the development of Chobani's "How Matters"

campaign and its aftermath.  Indeed, Mandel and Walsh had been falsely assuring Seidman that

WME had not been involved.  In addition, both of them led Seidman to believe at that time that WME was looking out for his interests.  Mandel told Seidman at the time that what Droga5 had done was "unconscionable," while Walsh told Seidman that he was "clearly the injured party."

83.     Chobani's use of the "How Matters" brand platform, facilitated by Seidman's "treasure trove" of "how matters" material that Mandel introduced to Droga5, have caused and will continue to cause harm to Seidman and LRN by disrupting their business and degrading  the value of their *how*-related vocabulary, including their "*how* matters" messaging and branding in particular.  In addition, Plaintiffs' hard-earned reputation for ethical behavior has been harmed by the false impression created by Chobani's "How Matters" campaign that Seidman and LRN "sold out" by becoming associated or affiliated with Chobani, or that they licensed, sponsored, or endorsed Chobani's products, practices, or their use of the "How Matters" brand platform for Chobani's commercial advantage.

## VII.    The HOW Trademarks

84.     Seidman has been issued numerous federal trademark registrations by the U.S. Trademark Office due to his and his licensee's use of HOW and a family of associated HOW-based marks, including HOW IS THE ANSWER, THE HOW REPORT, and HOW METRICS, namely, U.S. Reg. Nos. 4,210,276, 4,388,331, 4,632,757, 4,653,231, 4,657,090, and 4,704,500. Those registrations cover, among other things, "business and professional conduct by business organizations," "corporate and social values," "institutional behavior and culture," "corporate culture and business, cultural, social and environmental responsibility," "values-driven business and values-based business leadership," and "the management and operation of business in an environmentally  responsible  and  environmentally  sustainable  manner."  Copies  of  those registrations are attached hereto as Exhibit A.

85.     Seidman and LRN also own three additional pending trademark applications for HOW-based marks, all of which have been allowed by the U.S. Trademark Office.  A chart describing those applications is attached hereto as Exhibit B.

86.     As described above, Seidman and LRN promote the "*how* matters" messaging and philosophy, *inter alia*, by using their HOW-based marks in a wide array of business activities, advertising, and digital advertising, in the U.S. and internationally, including:  books, speeches, articles, newsletters, training programs, public presentations, webinars, on-line educational courses, workshops, website materials, social media, online advertising, surveys, and consulting services.  They also use promotional articles such as pins, T-shirts, bags, and bookmarks, which are widely disseminated at conferences and speaking engagements.



87.     Consumers of those products and services, here and abroad, include corporate leaders and company employees in many diverse industries; government leaders and employees; military leaders, and servicemen and women; leaders and executives in entertainment, sports,

marketing, and advertising; students, faculty and administrators in educational institutions; philanthropic and other nonprofit organizations; NGOs; and the general consuming public.

88.    Howistheanswer.com, Plaintiffs' primary online resource, features extensive uses of Plaintiffs' HOW-based marks.



89.    Defendants have willfully and intentionally appropriated Plaintiffs' marks and have used them to convey precisely the same meaning conveyed by Plaintiffs' HOW marks. Chobani has used those marks to distinguish itself as a company by how it does business, and to promote itself, for its own commercial advantage, as the leader of a "movement" to address precisely the same issues that Plaintiffs use the HOW marks to address.

90.    Defendants' infringing advertising campaign and brand platform are likely to cause consumers to mistakenly believe that Plaintiffs are associated or affiliated with Defendants or that Plaintiffs have licensed, sponsored or endorsed Chobani's products and practices or the infringing advertising campaign and brand platform.

91.    Defendants' infringing advertising campaign and brand platform are also likely to cause significant numbers of consumers falsely to believe that Plaintiffs are infringing Chobani's marks and misappropriating Chobani's messages.  Such reverse confusion has already been recognized by Droga5, as described above (see ¶ 72, *supra*), and is devastating to Plaintiffs'

hard-earned reputations for ethical behavior.   It severely jeopardizes LRN's business and Seidman's career, both of which are founded on the "*how* matters" message:   that "HOW" you conduct yourself in life, and in business, "matters."

### First Claim for Relief: Unfair Competition/Misappropriation
**(Against both Defendants)**

92.   Plaintiffs repeat the allegations contained in paragraphs 1 through 91 above.

93.   As discussed above, Defendants have, in bad faith, misappropriated Plaintiffs' "how"-related intellectual property, including Plaintiffs' unique "how" vocabulary, messaging, and marks, by taking and using for their own commercial purposes that intellectual property, which was created through the expense, skill, and labor of Plaintiffs.

94.   Defendants' use of Plaintiffs' "how" vocabulary, messaging, and marks in conjunction with the same meaning given to that vocabulary, messaging, and marks by Plaintiffs, is likely to cause and has caused confusion among consumers regarding supposed connections between Defendants and Plaintiffs, including confusion regarding whether Plaintiffs have somehow endorsed or otherwise approved Defendants' business, products, or campaign.   It furthermore places Defendants in direct competition with Plaintiffs in the market to promote "how"-related messaging and services related to that messaging.

95.   By these actions, Defendants have gained a financial benefit for themselves, and have caused financial loss and damages to Plaintiffs.

### Second Claim for Relief: Unjust Enrichment
**(Against both Defendants)**

96.   Plaintiffs repeat the allegations contained in paragraphs 1 through 95 above.

97.   Plaintiffs have expended significant effort, time, and money to create, develop, and protect their "how" vocabulary, messaging and marks, and the ideas and meaning associated

with that vocabulary, messaging, and marks, all of which have been used by Defendants, for Defendants' financial gain.

98.     Defendants have been enriched through their use of Plaintiffs' "how" vocabulary, messaging and marks, and the ideas and meaning associated with that vocabulary, messaging, and marks. Discovery in this case has shown that Defendants used Plaintiffs' "how" vocabulary, messaging and marks deliberately, knowing how critical they were (and are) to Plaintiffs' business.  Moreover, discovery in this case has shown that Defendant Droga5 knowingly used Plaintiffs' "how" vocabulary, messaging and marks from the beginning of its development of the "How Matters" campaign for Chobani, as a critical part of its successful effort to win the Chobani account, while Defendant Chobani knowingly participated in this wrongful use of Plaintiffs' "how" vocabulary, messaging and marks despite learning of the central importance of this vocabulary, messaging and marks to Plaintiffs' business months before the campaign was scheduled to launch.

99.     Given these facts, it is against equity and good conscience to permit Defendants to retain the benefits of their use of Plaintiffs' "how" vocabulary, messaging and marks, and the ideas and meaning associated with that vocabulary, messaging, and marks.

### Third Claim for Relief: Violation of New York Civil Rights Law Sections 50 and 51
### (Against both Defendants)

100.    Plaintiffs repeat the allegations contained in paragraphs 1 through 99 above.

101.    By publishing and disseminating the January 29, 2014 message (*see* ¶ 4, *supra*), Defendants have used Plaintiff Seidman's name within the State of New York for advertising purposes or for purposes of trade, without Plaintiff Seidman's consent.  That message unlawfully and falsely conveyed an affiliation or connection between Plaintiff Seidman and Defendant

Chobani, and improperly sought to leverage the goodwill Seidman and LRN have built up in their "how" messaging and vocabulary for Chobani's own profit.

102.    Discovery has revealed that the decision by Droga5 and Chobani to send this Twitter message to Seidman was made by high-level executives at Droga5 and Chobani, after internal debate, and has shown that the motivation behind sending the message to Seidman was commercial.

103.    Defendants' conduct violates Plaintiff Seidman's rights under Sections 50 and 51 of the Civil Rights Law of the State of New York.

104.    By reason of the foregoing, Plaintiff Seidman has suffered, and will continue to suffer, substantial damages.

### Fourth Claim for Relief: Trademark Infringement Under N.Y. G.B.L. § 360-K
**(Against both Defendants)**

105.    Plaintiffs repeat the allegations contained in paragraphs 1 through 104 above.

106.    Defendants used, without Plaintiffs' consent, a reproduction, counterfeit, copy, or colorable imitation of the HOW marks in connection with the sale, distribution, offering for sale, and advertising of goods and services on or in connection with which such use was and is likely to cause confusion or mistake, or to deceive as to the source of origin of such goods and services.

107.    Defendants reproduced, counterfeited, copied, and colorably imitated the HOW marks and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, and/or advertisements intended to be used upon or in connection with the sale or other distribution in New York of such goods and services.

108.    Defendants' infringing actions were willful and were committed with the intent to cause confusion, mistake, and/or to deceive.

109.    By reason of the foregoing, Plaintiffs have suffered, and will continue to suffer, substantial damages, and Defendants have reaped substantial profits.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor, and against Defendants, as follows:

(A)     Ordering Defendants to account for and pay to Plaintiffs all profits derived by reason of Defendants' acts alleged in this Complaint pursuant to N.Y. G.B.L. § 360-M, and New York State common law;

(B)     Awarding Plaintiffs all actual damages they have sustained as a result of Defendants' actions including, without limitation, damage to its business, reputation and goodwill, and the loss of sales and profits that they would have made but for Defendants' acts pursuant to N.Y. G.B.L. § 360-M, and New York State common law;

(C)     Awarding Plaintiffs treble damages pursuant to  N.Y. G.B.L. § 360-M;

(D)     Awarding Plaintiffs punitive damages;

(E)     Awarding Plaintiffs their costs of suit, including reasonable and necessary attorneys' fees and expenses for the prosecution and appeal, if any, of this matter pursuant to N.Y. G.B.L. § 360-M;

(F)     Directing Defendants to destroy any goods or marketing materials bearing Plaintiffs' HOW marks in the possession or under the control of either Defendant;

(G)     Directing Defendants to engage in corrective advertising, at their expense, at a scope commensurate with their advertising and promotion of the infringing marks;

(H)     Awarding Plaintiffs pre-judgment and post-judgment interest on all sums awarded in the Court's judgment; and

(I)      Granting Plaintiffs such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims and issues triable by a jury.


Dated:   April 13, 2017

SUSMAN GODFREY, LLP
*Attorneys for Plaintiffs Dov Seidman and*
*LRN Corporation*


By: /s/ *Stephen Shackelford Jr.*
     Stephen D. Susman
     Jacob W. Buchdahl
     Stephen Shackelford, Jr.
     Elisha B. Barron
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas 32 FL
New York, NY 10019
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340
ssusman@susmangodfrey.com
jbuchdahl@susmangodfrey.com
sshackelford@susmangodfrey.com
ebarron@susmangodfrey.com

37

# EXHIBIT A

# United States of America
## United States Patent and Trademark Office

# HOW

**Reg. No. 4,210,276**

**Registered Sep. 18, 2012**

**Int. Cls.: 16 and 41**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SEIDMAN, DOV (UNITED STATES INDIVIDUAL)
SUITE 700
1100 GLENDON AVENUE
LOS ANGELES, CA 90024

FOR: PUBLICATIONS, NAMELY, HAND-OUTS IN THE FIELDS OF LAW, ETHICS, BUSINESS REGULATORY COMPLIANCE, LEGAL COMPLIANCE, BUSINESS CONDUCT AND GOVERNANCE; PRINTED CORRESPONDENCE COURSE MATERIALS IN THE FIELD OF LAW, ETHICS, BUSINESS REGULATORY COMPLIANCE, LEGAL COMPLIANCE, BUSINESS CONDUCT AND GOVERNANCE; COURSE MATERIALS IN THE FIELDS OF LAW, ETHICS, BUSINESS REGULATORY COMPLIANCE, LEGAL COMPLIANCE, BUSINESS CONDUCT AND GOVERNANCE, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 9-29-2011; IN COMMERCE 9-29-2011.

FOR: EDUCATIONAL SERVICES, NAMELY, CONDUCTING CLASSES, SEMINARS, CONFERENCES AND WORKSHOPS IN THE FIELDS OF LAW, ETHICS, BUSINESS REGULATORY COMPLIANCE, LEGAL COMPLIANCE, BUSINESS CONDUCT AND GOVERNANCE AND DISTRIBUTION OF COURSE MATERIAL IN CONNECTION THEREWITH; PROVIDING ON-LINE TRAINING COURSES, SEMINARS, WORKSHOPS IN THE FIELDS OF LAW, ETHICS, BUSINESS REGULATORY COMPLIANCE, LEGAL COMPLIANCE, BUSINESS CONDUCT AND GOVERNANCE, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 9-21-2011; IN COMMERCE 9-21-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SN 77-470,734, FILED 5-9-2008.

TEJBIR SINGH, EXAMINING ATTORNEY



David J. Kappos

Director of the United States Patent and Trademark Office

---

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.

---

*ATTENTION MADRID PROTOCOL REGISTRANTS: The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at http://www.uspto.gov.

# United States of America
## United States Patent and Trademark Office

# HOW

**Reg. No. 4,388,331**

**Registered Aug. 20, 2013**

**Corrected Nov. 18, 2014**

**Int. Cls.: 16, 35, 41 and 45**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SEIDMAN, DOV (UNITED STATES INDIVIDUAL)
1100 GLENDON AVENUE, SUITE 700
LOS ANGELES, CA 90024

FOR: PUBLICATIONS, NAMELY, HAND-OUTS, CHARTS, ARTICLES AND NEWSLETTERS IN THE FIELDS OF BUSINESS COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, LEADER-SHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHAVIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ENVIRONMENTAL INNOVATION, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS, CULTURAL, SOCIAL AND ENVIRONMENTAL RESPONSIBILITY, ENTERPRISE AND ENVIRONMENTAL SUSTAINABILITY; ALL OF THE AFOREMENTIONED GOODS FOR USE BY BUSINESS EXECUTIVES, GOVERNMENT OFFICIALS, AND ORGANIZATION LEADERS INTERESTED IN ETHICS AND CORPORATE RESPONSIBILITY, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 9-29-2011; IN COMMERCE 9-29-2011.

FOR: PROVIDING ONLINE INFORMATION IN THE FIELDS OF BUSINESS ETHICS, BUSINESS ORAL AND WRITTEN COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, GOV-ERNANCE AND LEADERSHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHAVIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN BUSINESS AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE, BUSINESS CULTURAL AND SOCIAL RESPONSIBILITY, AND THE MANAGEMENT AND OPERATION OF BUSINESS IN AN ENVIRONMENTALLY RESPONSIBLE AND ENVIRONMENTALLY SUSTAINABLE MANNER; PROVIDING A WEBSITE FEATURING NEWS THAT RELATES TO AND IMPACTS BUSINESS IN THE FIELDS OF BUSINESS ETHICS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, LEADERSHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHA-VIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS CULTURAL AND SOCIAL RESPONSIBILITY, AND THE MANAGEMENT AND OPERATION OF BUSI-NESS IN AN ENVIRONMENTALLY RESPONSIBLE AND ENVIRONMENTALLY SUSTAIN-



Michelle K. Lee

Deputy Director of the United States
Patent and Trademark Office

**Reg. No. 4,388,331**   ABLE MANNER; ALL OF THE AFOREMENTIONED SERVICES FOR USE BY BUSINESS EXECUTIVES, GOVERNMENT OFFICIALS, AND ORGANIZATION LEADERS INTERESTED IN ETHICS AND CORPORATE RESPONSIBILITY, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 9-29-2011; IN COMMERCE 9-29-2011.

FOR: EDUCATIONAL SERVICES, NAMELY, PROVIDING ONLINE CLASSES AND PRESENTATIONS IN THE FIELDS OF BUSINESS COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, LEADERSHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHAVIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ENVIRONMENTAL INNOVATION, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS, CULTURAL, SOCIAL AND ENVIRONMENTAL RESPONSIBILITY, ENTERPRISE AND ENVIRONMENTAL SUSTAINABILITY; EDUCATIONAL SERVICES, NAMELY, CLASSES AND PRESENTATIONS IN THE FIELDS OF LAW, ETHICS, BUSINESS COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, LEADERSHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHAVIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ENVIRONMENTAL INNOVATION, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS, CULTURAL, SOCIAL AND ENVIRONMENTAL RESPONSIBILITY, ENTERPRISE AND ENVIRONMENTAL SUSTAINABILITY; PROVIDING LEARNING FORUMS IN THE FIELDS OF LAW, ETHICS, BUSINESS COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, LEADERSHIP, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ENVIRONMENTAL INNOVATION, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS, CULTURAL, SOCIAL AND ENVIRONMENTAL RESPONSIBILITY, ENTERPRISE AND ENVIRONMENTAL SUSTAINABILITY; PROVIDING AN ONLINE MONTHLY NEWSLETTER IN THE FIELDS OF LAW, ETHICS, BUSINESS COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, INSTITUTIONS, AND GOVERNMENT AGENCIES, LEADERSHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHAVIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ENVIRONMENTAL INNOVATION, ORGANIZATIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS, CULTURAL, SOCIAL AND ENVIRONMENTAL SUSTAINABILITY; ALL OF THE AFOREMENTIONED SERVICES FOR USE BY BUSINESS EXECUTIVES, GOVERNMENT OFFICIALS, AND ORGANIZATION LEADERS INTERESTED IN ETHICS AND CORPORATE RESPONSIBILITY, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 9-29-2011; IN COMMERCE 9-29-2011.

FOR: PROVIDING ONLINE INFORMATION IN THE FIELDS OF LAW, LEGAL ETHICS, BUSINESS REGULATORY COMPLIANCE, AND LEGAL COMPLIANCE, IN CLASS 45 (U.S. CLS. 100 AND 101).

FIRST USE 9-29-2011; IN COMMERCE 9-29-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 77-705,755, FILED 4-2-2009.

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL
### TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
### DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years\***
**What and When to File:**

>
> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.
>
> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

### The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
### reminder of these filing requirements.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date). The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

# United States of America

### United States Patent and Trademark Office

# HOW

**Reg. No. 4,704,500**

**Registered Mar. 17, 2015**

**Int. Cl.: 28**

**TRADEMARK**

**PRINCIPAL REGISTER**

SEIDMAN, DOV (UNITED STATES INDIVIDUAL)
1100 GLENDON AVENUE, SUITE 700
LOS ANGELES, CA 90024

FOR: BOARD GAMES, AND ROLE-PLAYING GAMES IN THE FIELDS OF BUSINESS COMMUNICATIONS, BUSINESS AND PROFESSIONAL CONDUCT BY BUSINESSES, IN-STITUTIONS, AND GOVERNMENT AGENCIES, LEADERSHIP, CORPORATE AND SOCIAL VALUES, INSTITUTIONAL BEHAVIOR AND CULTURE, CORPORATE GOVERNANCE, VALUES-DRIVEN AND VALUES-BASED BUSINESS LEADERSHIP, INSPIRATIONAL LEADERSHIP, ETHICAL LEADERSHIP, ENVIRONMENTAL INNOVATION, ORGANIZA-TIONAL DEVELOPMENT, CORPORATE CULTURE AND BUSINESS, CULTURAL, SOCIAL AND ENVIRONMENTAL RESPONSIBILITY, ENTERPRISE AND ENVIRONMENTAL SUS-TAINABILITY, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

FIRST USE 3-5-2008; IN COMMERCE 3-5-2008.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 4,210,276 AND 4,388,331.

SN 85-949,621, FILED 6-3-2013.

COLLEEN MULCRONE, EXAMINING ATTORNEY



*Michelle K. Lee*

Director of the United States
Patent and Trademark Office

## REQUIREMENTS TO MAINTAIN YOUR FEDERAL
## TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years***
**What and When to File:**

*First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

*Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# United States of America

## United States Patent and Trademark Office

# THE HOW REPORT

**Reg. No. 4,653,231**

**Registered Dec. 9, 2014**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SEIDMAN, DOV (UNITED STATES INDIVIDUAL)
1100 GLENDON AVENUE, SUITE 700
LOS ANGELES, CA 90024

FOR: PUBLICATIONS, NAMELY, WHITE PAPERS IN THE FIELD OF BUSINESS, NAMELY, BUSINESS ETHICS, CORPORATE CULTURE AND ORGANIZATIONAL BEHAVIOR, AND THEIR IMPACT ON BUSINESS PERFORMANCE, NAMELY, INNOVATION, RESILIENCY, EFFICIENCY, EMPLOYEE LOYALTY, CUSTOMER SATISFACTION, MISCONDUCT, AND FINANCIAL PERFORMANCE, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 12-31-2012; IN COMMERCE 12-31-2012.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "REPORT", APART FROM THE MARK AS SHOWN.

SN 85-587,158, FILED 4-2-2012.

ELIZABETH KAJUBI, EXAMINING ATTORNEY



Deputy Director of the United States
Patent and Trademark Office

<div style="border:1px solid black">

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

</div>

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

<div style="border:1px solid black">

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

</div>

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# United States of America

## United States Patent and Trademark Office

# HOW METRICS

**Reg. No. 4,632,757**

**Registered Nov. 4, 2014**

**Int. Cl.: 35**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SEIDMAN, DOV (UNITED STATES INDIVIDUAL)
1100 GLENDON AVENUE, SUITE 700
LOS ANGELES, CA 90024

FOR: BUSINESS ANALYSIS, ASSESSMENT AND REVIEW OF BUSINESS DATA, BUSINESS INFORMATION, ORGANIZATIONAL BEHAVIOR, CORPORATE CULTURE AND BUSINESS LEADERSHIP AS THEY RELATE TO BUSINESS PERFORMANCE, NAMELY, INNOVATION, RESILIENCY, EFFICIENCY, EMPLOYEE LOYALTY, CUSTOMER SATISFACTION, MISCONDUCT, AND FINANCIAL PERFORMANCE, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 12-31-2012; IN COMMERCE 12-31-2012.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "METRICS", APART FROM THE MARK AS SHOWN.

SN 85-587,159, FILED 4-2-2012.

ELIZABETH KAJUBI, EXAMINING ATTORNEY



Deputy Director of the United States
Patent and Trademark Office

---

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL
### TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
### DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# EXHIBIT B

## EXHIBIT B

### Plaintiffs' Pending Federal Trademark Applications

| Mark | App. No. | App. Date | Products/Services |
|------|----------|-----------|-------------------|
| HOW IS THE ANSWER | 85558020 | 3/1/2012 | Electronic downloadable publications, namely, books, newsletters hand-outs, workbooks, legal memoranda, executive training manuals, charts, research papers, white papers, articles, best practice guides, and handbooks in the fields of business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability. (Class 9)<br><br>Publications, namely, books, newsletters, hand-outs, workbooks, legal memoranda, executive training manuals, charts, research papers, white papers, articles, best practice guides, and handbooks in the fields of business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Printed matter, namely, a periodical focusing on the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability. (Class 16)<br><br>Educational services, namely, providing online information, classes, tutorials and presentations in the fields of business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and |

| | | | environmental sustainability; Educational services, namely, classes, tutorials and presentations in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Providing group coaching and learning forums in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Educational and entertainment services, namely, providing speaking services in the fields of business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Providing an online newsletter in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability.  (Class 41) |
|---|---|---|---|
| HOW | 85950205 | 6/4/2013 | Publications, namely, books, journals, reports, workbooks, training manuals, research papers, guides, and handbooks in the field of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, values-driven and values-based business leadership, |

inspirational leadership, ethical leadership, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; all of the aforementioned goods for use by business executives, employees, government officials, and organization leaders interested in ethics and corporate responsibility. (Class 16)

Consulting and advisory services in the fields of business ethics, business oral and written communications, business and professional conduct by businesses, institutions, and government agencies, business administration and management, business leadership development, corporate and social values, institutional behavior and culture, corporate governance, values-driven and values-based business leadership, inspirational leadership, ethical leadership, organizational development, corporate culture and business cultural and social responsibility; Business consulting services, namely, providing advice and assistance in the management and operation of business in an environmentally responsible and environmentally sustainable manner; Business consulting services, namely, providing assistance in development of business strategies and creative ideation; all of the aforementioned services for use by business executives, employees, government officials, and organization leaders interested in ethics and corporate responsibility.  (Class 35)

Educational and entertainment services, namely, providing tutorials, group coaching and speaking services in the fields of business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, values-driven and values-based business leadership, inspirational leadership, ethical leadership, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Online board games, computer games, card games, role-playing games and non-downloadable interactive games in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and

| | | | |
|---|---|---|---|
| | | | government agencies, business leadership, corporate and social values, institutional behavior and culture, corporate governance, values-driven and values-based business leadership, inspirational leadership, ethical leadership, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Entertainment services, namely, providing temporary use of non-downloadable interactive games; all of the aforementioned goods for use by business executives, employees, government officials, and organization leaders interested in ethics and corporate responsibility.  (Class 41) |
| HOW | 85969205 | 6/25/2013 | Computer game software, interactive computer game programs and downloadable computer game programs; Educational and training software featuring instruction and information in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, leadership, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Prerecorded DVDs featuring educational information in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, leadership, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and environmental sustainability; Downloadable webinars and publications, namely, books, presentation outlines, journals, charts, research papers, case studies, white papers, articles, newsletters, and handbooks in the fields of law, ethics, business communications, business and professional conduct by businesses, institutions, and government agencies, leadership, corporate and social values, institutional behavior and culture, corporate governance, leadership, environmental innovation, organizational development, corporate culture and business, cultural, social and environmental responsibility, enterprise and |

|  |  |  | environmental sustainability.  (Class 9) |
|--|--|--|--|

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify this 13th day of April, 2017 that I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification to the attorneys of record.

<div align="right">

<u>    /s/ <em>Stephen Shackelford, Jr.</em>    </u>
Stephen Shackelford, Jr.

</div>